UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

PEGGY GORDON,

    Plaintiff,

v.

HOLY CROSS HOSPITAL
GERMANTOWN, INC.,

    Defendant.

Civil Action No. TDC-18-1306

**MEMORANDUM OPINION**

Peggy Gordon, a former employee of Holy Cross Hospital Germantown, Inc. ("Holy Cross"), has filed this civil action alleging that Holy Cross discriminated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17 (2012); 42 U.S.C. § 1981; and the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't § 20–606 (West 2015). Pending before the Court is Holy Cross's Motion for Summary Judgment. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be granted.

**BACKGROUND**

The following facts are presented in the light most favorable to Gordon, the non-moving party. Gordon, who is African American, began working as an Emergency Room Technician at Holy Cross in April 2012. After she was hired, Gordon participated in a week-long training program on Holy Cross's policies and procedures and received copies of Holy Cross's Confidentiality Policy and Code of Conduct. From November 2016 until Gordon was terminated on February 23, 2017, Bridget Plummer, Holy Cross's Director of the Emergency Department and

Behavioral Health, served as Gordon's direct supervisor. Plummer is white. Gordon states, and Holy Cross does not dispute, that until the events which led to her termination, she maintained a spotless employment record and was never disciplined by Holy Cross.

On February 22, 2017, at approximately 8:30 or 9:00 p.m., Gordon went into Emergency Room 9 to prepare to draw the blood of a white female patient ("the Patient") who was accompanied by a white male family member ("the Family Member"). The Patient was crying, and when Gordon put the tourniquet on the Patient's arm, before she inserted the needle, the Patient began screaming at Gordon, "Take it off, take it off. You don't know what you're doing. I want you to go find me somebody else who knows what they're doing. You need to get out and go away." Gordon Dep. at 64, ECF No. 70-1. Gordon took the tourniquet off the Patient, apologized to her, and exited the room. She went to the nursing station to report that the Patient was very upset and asked the charge nurse, Patty Cleavenger, to go talk to the Patient. Cleavenger agreed to do so.

While Gordon was at a computer at the nurse's station, the Family Member, who was dressed in a United States Army uniform, came out of the Patient's room and began walking towards Gordon, waving his hands and yelling at Gordon that she had left the room without helping the Patient, that no one was helping the Patient, and that someone needed to come back in and help her. Gordon informed the Family Member that she had left the room because the Patient had asked her to do so, but the Family Member continued yelling that Gordon was supposed to help the Patient and not leave her. According to Gordon, at this point, she looked to Cleavenger as well as a Montgomery County police officer ("the Officer") who was on duty and observing the situation, to intervene. Both failed to do so. Both Cleavenger and the Officer are white.

When the Family Member saw that the Officer was not going to intervene, he continued berating Gordon and finally closed his fist and yelled, "I will bang your head in." *Id.* at 72. Then, another Holy Cross employee, Maggie Lanham, who is white, came out from between Rooms 9 and 10, stepped between Gordon and the Family Member, put up her hands and told the Family Member that he needed to go back to the Patient's room. For a few minutes, she attempted to convince him that he did not have to behave the way he was acting. The Family Member then went back into Room 9 with the Patient.

A short time later, the Family Member stepped outside Room 9 again and yelled for someone to come in and help the Patient. Again, Gordon went to Cleavenger and asked her to help the Patient or call the night supervisor. Cleavenger told Gordon that she would call the night supervisor later, so Gordon tried to call the night supervisor herself, but no one answered the phone. At some point during this exchange, a different nurse went into the Patient's room to help the Patient.

Although the Family Member did not physically threaten her again, Gordon still perceived him as posing a threat to her safety. She turned to the Officer and asked why he had not helped her and noted that whenever white employees are engaged in a conflict with patients or visitors, the Officer always steps in. According to Gordon, the Officer stated that he would not intervene because the Family Member was in military uniform. Gordon then asked the Officer to call 911, but the Officer stated that there was no emergency situation requiring a 911 call. Gordon then called hospital security. Two security officers responded to the scene: Adam Washington, who is African American, and Kristin Warfield, who is white. Gordon told Washington and Warfield what had happened and that she still felt threatened by the Family Member because when security was not present, he would come out and look for her. She also asked them to go talk to the Family

3

Member. The Officer, however, remained present and told them, "[W]e're not doing anything about it." *Id.* at 91. Gordon then stated to the Officer, "You do not let the white employees go through this. Why [isn't] anyone helping me?" *Id.* at 92. Both the Officer and Washington and Warfield declined her request that they go talk to the Family Member. Gordon then told them that she was going to call a hotline to find out what her rights were.

Gordon then proceeded to use the phone at the nurse's station to call a local television station's hotline known as "7 On Your Side." *Id.* at 102. The nurse's station was approximately two doors away from Emergency Room 9, where the Patient and the Family Member were located, and was in an area with other employees and patients nearby. When no one answered, Gordon left a voicemail message stating her name, that she was in Maryland, and that she had a problem with the military and police. She did not use the Patient's name or the Family Member's name and did not disclose any personal information about the Patient or the Family Member. Shortly after this call, the Patient and the Family Member apologized to Gordon for threatening her.

Washington, who had been standing next to Gordon while she called "7 On Your Side," reported the call to the Cleavenger. The call was also reported to the Holy Cross Security Supervisor, Fred Carmen, Jr., who then called Plummer, Gordon's direct supervisor, at home. According to Plummer, Carmen stated that Gordon had made the phone call in an intimidating manner, within view of the Family Member. After receiving Carmen's phone call, Plummer contacted Cleavenger and asked her to bring Gordon to a private location so that the three of them could discuss what had happened. The parties disagree about the length and substance of that conversation: Plummer has described a lengthy discussion about Gordon's encounter with the Family Member, while Gordon states that Plummer just told her that she would be fired for calling the hotline.

4

Regardless, it is undisputed that Plummer and Gordon had a longer discussion about the incident the following day after Plummer and Sharon Brader, the Nursing Director of Holy Cross, conducted an internal investigation. According to Plummer, during the meeting, Gordon admitted that she contacted "7 On Your Side" within earshot of the Patient's room. At the end of the meeting, Plummer and Brader stepped outside to discuss the information provided by Gordon and consult with Human Resources regarding the appropriate course of action. They decided that Gordon should be terminated for knowingly violating Holy Cross's Confidentiality Policy and Code of Conduct. The termination letter that they provided to Gordon stated, in relevant part: "When you did not follow your chain of command and contacted the media regarding a difficult interaction with a family, you violated the Holy Cross Health: Confidentiality policy and Holy Cross Health Standards of Conduct. Your behavior was reckless. Therefore, your employment with Holy Cross Health is terminated effective today, February 23, 2017." Termination Notice at 8, ECF No. 58-3.

On May 22, 2017, Gordon filed a complaint with the Maryland Commission on Civil Rights, which was cross-filed with the United States Equal Employment Opportunity Commission ("EEOC"), alleging that her termination from Holy Cross was the result of race discrimination. On August 21, 2017, the EEOC issued to Gordon a Notice of Right to Sue based on its determination that it would not be able to complete its administrative processing of her charge within 180 days of its filing. On November 20, 2017, Gordon timely filed this lawsuit in the Circuit Court for Montgomery County, Maryland. Holy Cross removed the case to this Court. The operative Second Amended Complaint asserts causes of action for violations of (1) Title VII; (2) 42 U.S.C. § 1981; and (3) the MFEPA.

## DISCUSSION

In its Motion for Summary Judgment, Holy Cross argues that Gordon cannot establish a *prima facie* case of discrimination because she has not shown that she was meeting Holy Cross's legitimate performance expectations and because she has failed to identify a similarly situated white employee who was treated more favorably under comparable circumstances. Holy Cross also argues that even if Gordon established a *prima facie* case, she has not put forth any evidence to establish to that Holy Cross's asserted legitimate non-discriminatory reason for firing her was a pretext for race discrimination.

### I.  Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

### II.  Discriminatory Treatment

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII case law applies to both § 1981 and MFEPA claims, so the Court evaluates all three causes of action under Title VII standards. *See Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 788-89 (D. Md. 2013) (citing *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 n.1 (4th Cir. 2004), and *Haas v. Lockheed Martin Corp.*, 914 A.2d 735, 742 (Md. 2007)); *Nana-Akua Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc.*, 921 F. Supp. 2d 470, 483 n.20 (D. Md. 2013) ("Section 1981 and FEPA claims of discrimination are analyzed under the same framework as Title VII.").

To evaluate Title VII claims in the absence of direct evidence of discriminatory intent, courts apply the burden-shifting analysis outlined in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011). The burden is first on the plaintiff to establish a *prima facie* case of discrimination. *Id.* Upon such a showing, the burden shifts to the employer to assert a "legitimate, nondiscriminatory reason" for the allegedly discriminatory conduct. *Id.* (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004)). If the employer makes that showing, the burden shifts back to the plaintiff to demonstrate that the employer's purported reasons are a "pretext for discrimination." *Id.* at 558–59 (quoting *Hill*, 354 F.3d at 285).

To establish a *prima facie* claim for race, color, or national origin discrimination based on disparate treatment, a plaintiff must present facts demonstrating: (1) the plaintiff's membership in a protected class; (2) the plaintiff's satisfactory job performance; (3) that the plaintiff was subjected to an adverse employment action; and (4) that similarly situated employees outside the protected class received more favorable treatment. *White v. BFI Waste Svcs., Inc.*, 375 F.3d 288, 295 (4th Cir. 2004). When the claim is discriminatory termination, the elements are altered slightly. A

plaintiff must then present facts demonstrating: (1) the plaintiff's membership in a protected class; (2) that the plaintiff was terminated; (3) that at the time of the termination, the plaintiff was performing at a level that met the employer's legitimate expectations; and (4) that the position was filled by a similarly qualified applicant from outside the protected class. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

### A.   *Prima Facie* Case

There is no dispute that Gordon has alleged sufficient facts to establish two elements of a *prima facie* case. As an African American woman, Gordon is a member of a protected class, and she was summarily terminated. However, Holy Cross argues that Gordon has not shown that she was performing at a level that met her employer's legitimate expectations at the time that she was fired. Specifically, Holy Cross states that Gordon's conduct on the night of February 22, 2017—specifically, calling "7 On Your Side" about a patient issue in the middle of a busy Emergency Room instead of following her chain of command—renders her performance dissatisfactory *per se* because it violated company policy. For this principle, Holy Cross cites two non-binding cases: *Hawkins v. Sheppard Pratt Hospital*, 32 F. App'x 44 (4th Cir. 2002), and *Blair v. Colonnas Shipyard, Inc.*, 52 F. Supp. 2d 687 (E.D. Va. 1999), *aff'd*, 203 F.3d 819, 2000 WL 4917 (4th Cir. 2000).

In *Hawkins*, an unpublished case, the United States Court of Appeals for the Fourth Circuit affirmed without discussion the district court's holding that a plaintiff who worked at a hospital and disclosed patient information in violation of her employer's policy was not meeting her employer's legitimate expectations. *Hawkins*, 32 F. App'x at 45. However, the Fourth Circuit did not address the extent to which the plaintiff's violation interfered with her job performance on an ongoing basis or coincided with other shortcomings in her job performance. Lacking this

information, the Court does not rely on *Hawkins* for the principle that any isolated violation of company policy constitutes a failure to meet the employer's legitimate performance expectations for purposes of a *prima facie* case. In *Blair*, the court found that an employee who failed to procure a required doctor's note and submitted false information about his absence violated his employer's policies and therefore did not meet the employer's performance expectations. *Blair*, 52 F. Supp. 2d at 694. Likewise, however, the court in *Blair* never held that all violations of corporate policy constitute inadequate performance, especially when those violations constitute specific instances of misconduct rather than ongoing poor performance.

Rather, a single instance of misconduct is more relevant to the question of the employer's legitimate nondiscriminatory reason for termination. In *Holland v. Washington Homes*, 487 F.3d 208 (4th Cir. 2007), the plaintiff was allegedly fired for making threatening remarks to his supervisor, but where, as here, the defendant did not dispute that Holland had performed his job adequately prior to the threats, the court analyzed his misconduct under the second phase of the *McDonnell Douglas* burden-shifting analysis—namely, by evaluating whether his threats to his supervisor constituted the employer's legitimate non-discriminatory reason for firing Holland. *See Holland*, 487 F.3d at 212, 214. By contrast, in cases in which the plaintiff had an ongoing history of poor job performance, courts have analyzed that deficiency as a failure to satisfy the *prima facie* case element of meeting the employer's legitimate expectations. *See King*, 328 F.3d at 147-49 (holding that a teacher who received repeated reprimands for being unprepared for class and having deficient lesson plans failed to show that he was meeting his employer's legitimate job expectations); *Warch v. Ohio Casualty Ins. Co.*, 435 F.3d 510, 517-18 (4th Cir. 2006) (holding that an employee who had been put on probation after a string of negative reviews related to

multiple areas of his job performance failed to show that he was meeting his employer's legitimate job expectations).

Although in *Warch*, the Fourth Circuit declined to adopt the principle that "when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason produced by the defense," it did not conclude that a single instance of misconduct alleged to be the nondiscriminatory reason for termination, by itself, establishes a failure to meet employer expectations. *Warch*, 435 F.3d at 515. Rather, the court recognized the "danger" of applying the "expectations" element of the *prima facie* case too strictly and distinguished between cases "where there is . . . one event that sparked the termination" and those involving a "long string of performance problems leading up to the firing." *Id.* at 516.

This case aligns more closely with *Holland*. Where Gordon's alleged misconduct on the night of February 22, 2017 was a single act external to her core job requirements, any policy violation stemming from that incident is more fairly analyzed as part of the inquiry into Holy Cross's legitimate non-discriminatory reason for terminating Gordon rather than as necessarily establishing that she was not performing her job in a satisfactory fashion. Though it may be considered on the issue of satisfactory job performance, *see Warch*, 435 F.3d at 515, where Gordon has presented undisputed evidence through her sworn affidavit that she had never been disciplined or received negative performance reviews prior to February 22, 2017, the Court concludes that, at a minimum, there is a genuine issue of material fact whether she was meeting her employer's legitimate job expectations at the time that she was fired.

Thus, the Court turns to the fourth requirement for a *prima facie* case of discriminatory termination: whether Gordon has introduced evidence that she was treated differently from

similarly situated white employees or that her position was filled by a similarly qualified applicant who was outside the protected class. *See White*, 375 F.3d at 295; *King*, 328 F.3d at 149. On this prong, the existence of a white comparator is not a necessary element of the plaintiff's claim if the plaintiff can introduce other circumstantial evidence of discrimination. *See Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 545-46 (4th Cir. 2003). Nevertheless, Gordon has failed to present evidence sufficient to meet this requirement.

"The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008). In this case, where the only alleged adverse employment action is Gordon's termination, in order to provide a meaningful comparison, Gordon would have to identify white employees who engaged in similar conduct that allegedly violated Holy Cross's Confidentiality Policy or Code of Conduct but were not disciplined with the harsh sanction of termination. Alternatively, she could introduce evidence that a person who was not African American was hired to fill her position after she was terminated.

Gordon does not point to any white employees who fall into either of these categories. Instead, she asserts in her affidavit and deposition testimony that similarly situated white employees received better protection from hospital security officers and law enforcement officers when faced with hostile patients and visitors. In Gordon's affidavit, she generally states that "Caucasian employees are protected closely by Hospital Security and the Police Officers who work for the Defendant" without further detail. Gordon Aff. ¶ 6, ECF No. 62-2. In her deposition, she testified about several occasions when white Holy Cross employees, including Cleavenger, another nurse named Amanda Pickering, and an employee she refers to as "Jenn I.," had verbal altercations with patients or their family members, and hospital security rushed to the scene to intervene on

their behalf. It is not clear that this testimony is sufficient to establish that these white employees were similarly situated. Gordon did not obtain affidavits from those employees or any of the individuals involved, and she conceded during her deposition that she never heard the exact nature of the threats that were made against them, such that the Court cannot assess the similarity of those scenarios to Gordon's interaction with the Family Member. Moreover, Gordon acknowledged that the Officer's asserted reason that he would not intervene on her behalf was because the Family Member was in military uniform, a fact not known to be present in the case of the comparator employees. But even if these white employees were similarly situated to Gordon as to the provision of security, such comparative evidence does not show disparate treatment on the issue of her termination, which is the only adverse employment action alleged in her Second Amended Complaint.

And even if Gordon had cited Holy Cross security personnel's alleged failure to protect her as a violation of Title VII, such a claim would ordinarily not be cognizable under Title VII, which requires "a discriminatory act that adversely affects the terms, conditions, or benefits of the plaintiff's employment. *Holland*, 487 F.3d at 219 (internal citations omitted). Such an "adverse employment action" consists of discharge, demotion, a decrease in pay or benefits, a loss of job title or supervisory responsibility, reduced opportunities for promotion, or a reassignment resulting in one or more these consequences. *See Boone v. Goldin*, 178 F.3d 253, 255-57 (4th Cir. 1999) (allowing for the possibility that a reassignment to a significantly more stressful position could constitute an adverse employment action). Gordon did not allege any such action against her other than her termination.

Beyond the lack of comparators on the issue of discriminatory termination, Gordon has provided no evidence of discriminatory intent. She has acknowledged that no one involved,

including Plummer and Brader, ever made any racially-derogatory comments to her or anyone else, and she has not introduced any other circumstantial evidence of race discrimination. Accordingly, the Court finds that she has failed to provide sufficient evidence to establish a *prima facie* case of employment discrimination.

### B. Legitimate Non-Discriminatory Reason and Pretext

Because Gordon has not established a *prima facie* case of employment discrimination, Holy Cross is "under no duty to supply an explanation for [her] discharge." *King*, 328 F.3d at 150. Even so, the Court finds that Holy Cross has met its burden of producing a "legitimate, nondiscriminatory reason" for the allegedly discriminatory conduct, and Gordon has not demonstrated that Holy Cross's purported reasons for firing her are a "pretext for discrimination." *Adams*, 640 F.3d at 558-59.

Holy Cross asserts that Gordon was terminated because she engaged in reckless misconduct by contacting the media regarding a difficult interaction with a patient's family member rather than raising her concerns through her chain of command, in violation of Holy Cross's Confidentiality Policy and Code of Conduct. Gordon counters that Holy Cross's proffered reasons for her termination were pretextual because her decision to call "7 On Your Side" was justified under the circumstances where she felt threatened and security personnel refused to intervene to protect her. However, to demonstrate pretext, a plaintiff must show that the employer's assessment of her conduct was dishonest or not the real reason for her termination, rather than merely dispute the merits of the employer's termination decision. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000). Such a showing is required because "in a wrongful discharge action it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Id.* (internal citations omitted). The job of the Court is not to "appraise

13

[the employer's] appraisal"; rather, its "sole concern is whether the reason for which the defendant discharged the plaintiff was discriminatory." *Id.*

To the extent that Holy Cross claims that Gordon's call to "7 On Your Side" violated its Confidentiality Policy, the evidence does not appear to support that claim. Holy Cross's Confidentiality Process states: "Information about current or former patients in any form (verbal, written, or electronic) is confidential and protected by the law. . . . Those who have a need to know must discuss patient information only in private, confidential places." Confidentiality Policy at 10-11, ECF No. 58-3. Even though Plummer states that Gordon told "7 On Your Side" that she wanted to make a complaint about a military family member of a patient, the contemporaneous report from Washington, as well as Washington's declaration, both reflect that Gordon merely stated in her voicemail "that she was in Maryland and that she had a problem with the military and police." Washington Incident Report at 6, ECF No. 58-4. Washington's account, which is most likely to be accurate because he, not Plummer, directly heard Gordon's call, makes no mention of a patient issue or even a medical setting. Even under Plummer's version, Holy Cross has provided no evidence that Gordon revealed any identifying information about the Patient or her condition, and Gordon affirmatively testified that she did not do so. Thus, the claim that Gordon violated the Confidentiality Policy is not supported by the evidence.

The evidence better supports Holy Cross's claim that Gordon's call to "7 On Your Side" violated its Code of Conduct. The Code of Conduct states: "All persons associated with Holy Cross Health have a responsibility to exercise integrity, honesty, and sound judgment when performing job responsibilities." Code of Conduct at 15, ECF No. 58-3. It also recommends a four-step process for employees who find themselves in difficult situations in which they do not know how to respond, including contacting first one's immediate supervisor, then Human

Resources, then the Holy Cross Health integrity officer, and finally a toll-free internal hotline for Holy Cross staff. Plummer testified that she and Brader determined that Gordon's call to "7 On Your Side" reflected poor judgment by going outside her chain of command and neglecting to follow the four-step process detailed above. Indeed, the termination letter provided to Gordon strongly suggests that Holy Cross fired Gordon for making a scene in front of patients and acting in an unprofessional manner by openly criticizing her colleagues, which reflected poorly on Holy Cross and resulted in the determination that it constituted grounds for termination.

Where Holy Cross has presented evidence of a legitimate non-discriminatory reason for terminating Gordon, she must provide evidence sufficient to raise a genuine issue of material fact whether that reason was pretextual and that the true reason was discrimination. Here, there is no evidence that Plummer or Brader ever made racially derogatory statements, acted in a discriminatory fashion, treated white employees more favorably for comparable policy violations, or even hired a white employee to fill Gordon's spot after terminating her. Thus, the Court concludes that Gordon has not provided sufficient evidence to support a verdict in her favor.

In so ruling, the Court does not conclude that Holy Cross's decision to terminate Gordon was fair. It is undisputed that Gordon was mistreated and threatened by the Family Member; in fact, the Family Member later apologized for his actions. Gordon also had a right to expect that the Officer or hospital security would intervene to protect her from the Family Member. She was justifiably upset when the Officer did not do so, particularly because his stated reason for failing to intervene, that the Family Member was in military uniform, was either based on a misguided and mistaken belief that he had no authority over such an individual, or an unwillingness to confront an arguably intimidating individual. The fact that a non-security staff member, Maggie Lanham, eventually stepped in to confront the Family Member reveals that the Officer could have

and should have done so earlier. Gordon then received little to no support from her supervisors or hospital security. Thus, the fact that Gordon overreacted and called "7 on Your Side," though exhibiting poor judgment, should have been viewed in the context of the extremely disturbing episode that Gordon had just experienced. Particularly where Gordon had never had any negative findings on her employment record, there is a real question whether immediate termination for this first transgression, rather than a lesser sanction such as a suspension, reprimand, or counseling, was truly necessary, particularly where no patient information was disclosed inappropriately.

A court, however, "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *DeJarnette v. Corning Inc.*, 133 F.3d 292, 299 (4th Cir. 1998) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997)). Although Holy Cross has not convinced the Court that its decision to terminate Gordon was fair under the circumstances, the Court's sole task is to determine if there is a genuine issue of material fact whether Gordon's termination was motivated by race discrimination. Where she has not shown that similarly situated white employees were not terminated for similar transgressions, and she does not contend that there is any evidence that her supervisors had previously displayed racial animus, the Court concludes that Gordon has not provided evidence to support the conclusion that the Gordon was terminated based on her race. The Court therefore must grant summary judgment in favor of Holy Cross.

## CONCLUSION

For the foregoing reasons, Holy Cross's Motion for Summary Judgment will be granted. A separate Order shall issue.

Date: May 29, 2019

THEODORE D. CHUANG
United States District Judge